Dr. Paul KURTZ, Plaintiff,

v.

James A. BAKER, Secretary of the
Treasury, et al., Defendants.

Civ. A. No. 84–2919.

United States District Court,
District of Columbia.

March 11, 1986.

Ronald Lindsay, Washington, D.C., for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. DiGenova, U.S. Atty., Sandra M. Schraibman, Stephanie L. Golden, Attys., U.S. Dept. of Justice, Washington, D.C., for Baker and Ortega.

Michael Davidson, Senate Legal Counsel, M. Elizabeth Culbreth, Deputy Senate Legal Counsel, Morgan J. Frankel, Asst. Senate Legal Counsel, Washington, D.C., for Reverend Richard C. Halverson.

Michael Davidson, M. Elizabeth Culbreth, Senate Legal Counsel, Morgan J. Frankel, John C. Grabow, for Senate Chaplain.

Steven R. Ross, General Counsel to the Clerk, Michael L. Murray, Asst. Counsel to the Clerk, U.S. House of Representatives, Washington, D.C., for Chaplain James D. Ford.

## MEMORANDUM

OBERDORFER, District Judge.

In this action, plaintiff challenges certain practices of the Chaplain of the United States House of Representatives and the Chaplain of the United States Senate. Plaintiff is a professor of philosophy and a

secular humanist. Defendants are the Secretary of the Treasury, the Treasurer of the United States, the Chaplain of the House and the Chaplain of the Senate.

Plaintiff's complaint contains two counts. Count I challenges the administration of an informal program whereby both the House and Senate Chaplains allow guest chaplains to give the morning prayer (guest chaplain program). Plaintiff alleges that he wrote to both Chaplains requesting the opportunity to appear as a guest speaker and to deliver the opening remarks at a daily session of the House or Senate. In his application letters, plaintiff made clear that his remarks would not invoke a diety. Both Chaplains rejected plaintiff's request, stating as one of their reasons that plaintiff would not offer a prayer during his opening. Plaintiff alleges that the guest chaplain program discriminatorily excludes nontheists in violation of the Free Speech, Free Exercise, and Establishment Clauses of the First Amendment, and the Due Process Clause of the Fifth Amendment, of the United States Constitution. Plaintiff seeks to enjoin the allegedly discriminatory practice and seeks a declaration that the practice is unconstitutional. In the alternative, plaintiff seeks termination of federal funding of the House and Senate chaplaincies.

Count II alleges that the Senate Chaplain "has routinely used his opening remarks as a vehicle for disparaging the beliefs of non-theists ..." Complaint at ¶ 44 (filed Sept. 19, 1984). Plaintiff alleges that the Senate Chaplain's remarks violate the Establishment Clause of the First Amendment. Plaintiff seeks a permanent injunction to restrain all present and future chaplains from making disparaging remarks concerning the beliefs of non-theists, and a declaration that the making of such remarks by a chaplain is unconstitutional. In the alternative, plaintiff seeks the termination of federal funding of the chaplaincies.

This action is now before the Court on defendants' motions to dismiss or for summary judgment,[1] and plaintiff's motion for summary judgment on Count II. Motion of Defendants Regan and Ortiz to Dismiss or in the Alternative for Summary Judgment (filed Dec. 19, 1984); Motion of Defendant Senate Chaplain to Dismiss or for Summary Judgment (Senate Chaplain's Mem.) (filed Dec. 19, 1984); Defendant Chaplain Ford's Motion to Dismiss (House Chaplain's Mem.) (filed Dec. 21, 1984); Plaintiff's Motion for Partial Summary Judgment (Plaintiff's Mem.) (filed Feb. 4, 1985).

I.

A.

The Supreme Court's decision in *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), provides the guidelines for resolution of Counts I and II. In *Marsh*, a state legislator and taxpayer brought an action challenging the practice of the Nebraska legislature of opening each session with a prayer by a chaplain paid with public funds. The Supreme Court, per Chief Justice Burger, found that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply imbedded in the history and tradition of this country." 463 U.S. at 786, 103 S.Ct. at 3332. The Court continued:

Standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees, but there is far more here than simply historical patterns. In this context, historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the First Congress—their actions reveal their intent....

... It can hardly be thought that in the same week Members of the First Congress voted to appoint and to pay a chaplain for each House and also voted to approve the draft of the First Amendment for submission to the states, they intended the Establishment Clause of the

1. Defendants have filed three separate motions, but because they all raise substantially the same issues, defendants' arguments will be referred to collectively.

Amendment to forbid what they had just declared acceptable.

*Id.* at 790, 103 S.Ct. at 3334. The Court concluded:

> This unique history leads us to accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a practice of prayer similar to that now challenged.
>
> . . . .
>
> In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among people of this country. As Justice Douglas observed, "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson,* 343 U.S. 306 [72 S.Ct. 679, 96 L.Ed. 954] (1952).

*Id.* at 791–92, 103 S.Ct. at 3335–36.

After finding the practice of opening legislative sessions with a prayer invoking Divine guidance to be constitutional, the Court then examined whether any particular features of the Nebraska practice violated the Establishment Clause. The particular features examined were:

> first, that a clergyman of only one denomination—Presbyterian—has been selected for 16 years; second, that the chaplain is paid at public expense; and third, that the prayers are in the Judeo-Christian tradition.

*Id.* at 793, 103 S.Ct. at 3336 (footnotes omitted).

The Court found that the chaplain's long tenure did not in effect give impermissible preference to his religious views, noting the practice in Nebraska of inviting guest chaplains. The Court found remuneration of the chaplain by public funds to be "grounded in historic practice initiated ... by the same Congress that drafted the Establishment Clause of the First Amendment," *id.* at 794, 103 S.Ct. at 3336, and thus constitutionally acceptable. As to the fact that the prayers given were in the Judeo-Christian tradition, the Court held that

> [t]he content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

*Id.* at 794–95, 103 S.Ct. at 3337.

Justice Brennan, joined by Justice Marshall, dissented from the Court's opinion. Justice Brennan argued that "legislative prayer [viewed] through the unsentimental eye of our settled doctrine," *id.* at 796, 103 S.Ct. at 3338 (Brennan, J., dissenting), clearly violates the three-pronged test of *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971): its purpose is religious, not secular; its primary effect advances a particular religion, and religion in general; and it fosters excessive entanglement of government with religion. As to the application of Establishment Clause doctrine, Justice Brennan concluded:

> I have no doubt that, if any group of law students were asked to apply the principles of *Lemon* to the question of legislative prayer, they would nearly unanimously find the practice to be unconstitutional.

*Id.* 463 U.S. at 800–01, 103 S.Ct. at 3340 (footnote omitted). Justice Brennan also examined the historical purpose of the Establishment Clause and found "the regularized practice of conducting official prayers, on behalf of the entire legislature, as part of the order of business constituting the formal opening of every single session of the legislative term," *id.* at 813, 103 S.Ct. at 3346, to violate that purpose. Finally, Justice Brennan questioned the Court's reliance "on a narrow piece of history," *id.* at

817, 103 S.Ct. at 3349, and found the Establishment Clause violation resulting from the practice of legislative prayer far from *de minimus.*

Justice Stevens also dissented from the Court's opinion, noting:

> The Court declines to "embark on a sensitive evaluation or to parse the content of a particular prayer." ... Perhaps it does so because it would be unable to explain away the clearly sectarian content of some of the prayers given by Nebraska's chaplain. Or perhaps the Court is unwilling to acknowledge that the tenure of the chaplain must inevitably be conditioned on the acceptability of that content to the silent majority.

*Id.* at 823–24, 103 S.Ct. at 3352 (Stevens, J., dissenting) (footnote omitted).

### B.

Another case crucial as background for this action is *Murray v. Buchanan,* 720 F.2d 689 (D.C.Cir.1983) (en banc). Plaintiffs in that case challenged the payment of salaries and certain expenses for the House and Senate Chaplains, and Acts of Congress authorizing and appropriating funds for those expenditures. After argument of the appeal before the *en banc* Court of Appeals, the Supreme Court decided *Marsh.* The Court directed the parties to show cause why, in light of *Marsh,* the appeal should not be dismissed for failure to raise a substantial constitutional question. The Court concluded:

> We perceive no tenable basis for a claim that the very congressional practice deliberately traced by the Court in *Marsh* should be subject to further review.

720 F.2d at 690. The Court dismissed the appeal, vacated the judgment of the district court, and remanded with instructions to dismiss the complaint for want of a substantial constitutional question.

### II.

Defendants first raise several jurisdictional concerns. They argue that plaintiff lacks standing to raise his claims, that his challenges present nonjusticiable political questions, and that his action is barred by the Speech and Debate Clause of the Constitution, U.S. Const. Art. I, § 6, cl. 1.

### A.

#### 1.

■ In their challenge to plaintiff's standing as to Count I, defendants argue that plaintiff has failed to meet the standing requirements of Article III of the Constitution affirmed by the Supreme Court in *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). To demonstrate that he has standing, a plaintiff must show:

> "... that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 [99 S.Ct. 1601, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976).

454 U.S. at 472, 102 S.Ct. at 758 (footnote omitted).

■ Defendants argue that no one has the right to address Congress on topics of their personal concern, citing *Minnesota State Board for Community Colleges v. Knight,* 465 U.S. 271, 104 S.Ct. 1058, 1065, 79 L.Ed.2d 299 (1984). They contend that plaintiff's claim is merely that Congress should listen to his point of view, and as such, establishes no actual injury. Plaintiff's claim, however, is more specific. He argues that he has standing under the Free Speech Clause of the First Amendment because "he has been refused the opportunity to speak at a limited public forum (or nonpublic forum)." Plaintiff's Mem. at 38–39. *See Perry Education Assoc. v. Perry Local Educators' Assoc.,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Although it may be true that citizens do not general-

ly have the right to address Congress on topics of personal concern, a limited public forum or a nonpublic forum is created specifically by the government's opening of a certain forum for expressive activity even though it is not obliged to do so. *Id.* at 45, 103 S.Ct. at 954, *Widmar v. Vincent*, 454 U.S. 263, 267–68, 102 S.Ct. 269, 273–74, 70 L.Ed.2d 440 (1981). Once the government has created a limited public, or nonpublic, forum, it is prohibited, at a minimum, from denying access to a speaker who wants to speak on an otherwise includible subject on the basis of the viewpoint the speaker intends to address. 460 U.S. at 46, 103 S.Ct. at 955.

■ Plaintiff argues that by opening their podiums to other chaplains who desire to give opening remarks to Congress, each Chaplain has created a limited public forum or a nonpublic forum for opening remarks. As such, plaintiff's argument is that he has discriminatorily been denied access to express his viewpoint. As to the specific requirements set out in *Valley Forge, supra,* plaintiff first demonstrates that he personally requested, and was denied, access to this particular forum on the grounds that his viewpoint was inappropriate. Plaintiff has thus demonstrated a grievance more specific that the general grievance of a citizen who wants to address Congress on an issue of concern. Second, plaintiff alleges that the defendant Chaplains' conduct in denying him access directly caused his alleged injury. Finally, he claims to meet the third *Valley Forge* requirement for standing in that a decision in his favor would provide him with relief. Here, plaintiff's injury could be redressed either by an order or declaration holding that the basis for denying access to him is unlawful, or an order terminating the funding of the chaplaincies and thereby abolishing the forum at issue. Plaintiff thus meets the Article III requirements for standing under Count I of his complaint.

### 2.

■ Under Count II of plaintiff's complaint, defendants again argue that plaintiff's claim that the Senate Chaplain disparages non-theism is only a generalized claim of disagreement with the practice of legislative prayer which was found constitutional by the Supreme Court in *Marsh.* But, plaintiff argues, citing specific language in *Marsh,* 463 U.S. at 794–95, 103 S.Ct. at 3336–37, that the Supreme Court in that case inferentially, but clearly, disapproved of the use of traditional legislative prayer to disparage any other faith or any other belief than that espoused by the authorized prayer giver. Plaintiff's claim that the Senate Chaplain disparages non-theism is not merely a claim of general affront, but represents a specific claim that the statements of this person supported by congressionally-appropriated funds violate the Establishment Clause. The Supreme Court in *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), held that even an individual taxpayer has standing to challenge congressional expenditures which allegedly violate the Establishment Clause. Plaintiff is here not only as a taxpayer, but as a petitioner for an opportunity to participate in Congress' opening ceremonies. Suffice it to say here, however, as this Court noted in the companion case to this action, in which this same plaintiff challenged the printing and binding of the Chaplains' prayers:

> [A] taxpayer retains standing to challenge the use of appropriated funds in ways that violate the Establishment Clause of the First Amendment.

*Kurtz v. Kennickell,* 622 F.Supp. 1414, 1416 (D.D.C.1985). Moreover, the Court in *Murray* dismissed a similar claim, not for lack of standing, but, for failure to state a viable constitutional claim after the Supreme Court's decision in *Marsh.* And, the *Marsh* Court recognized plaintiff's standing to raise a similar claim. *See also Katcoff v. Marsh,* 582 F.Supp. 463, 467–71 (E.D.N.Y.1984), *affd. in pertinent part,* 755 F.2d 223 (2d Cir.1985). Plaintiff here thus has standing to raise his claim under Count II.

### B.

■ Defendants argue that plaintiff's action presents a political question made

nonjusticiable by the principles articulated in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and thus should be dismissed. Specifically, defendants argue that the Constitution allows the House and Senate to determine their rules of procedure, U.S. Const. Art. I, § 5, and thus reflects a "textually demonstrable constitutional commitment" of the issues presented to the Legislative Branch. *Powell v. McCormack,* 395 U.S. 486, 517, 89 S.Ct. 1944, 1961, 23 L.Ed.2d 491 (1969). Plaintiff points out, however, that his challenges are not directly to rules of procedure: no House or Senate rule authorizes the Chaplains to invite guest chaplains, and no rule authorizes disparagement of others' beliefs by the Chaplains. Moreover, our Court of Appeals recently made clear that the political question doctrine does not preclude review of House and Senate rules for their constitutionality, stating:

> ... Article I simply means that neither we nor the Executive Branch may tell Congress what rules it must adopt. Article I does not alter our judicial responsibility to say what rules Congress may not adopt because of constitutional infirmity.

*Vander Jagt v. O'Neill,* 699 F.2d 1166, 1173 (D.C.Cir.1982), *cert. denied,* 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983); *see United States v. Ballin,* 144 U.S. 1, 5, 12 S.Ct. 507, 509, 36 L.Ed. 321 (1892) ("[Congress] may not by its rules ignore constitutional restraints ..."). The Court of Appeals' apparent willingness to dispose of similar claims on the merits in *Murray* is also persuasive.

Here, plaintiff does not directly challenge House or Senate rules. He challenges the discretionary behavior of their chosen Chaplains. The Chaplains occupy publicly-funded offices and thus their conduct in those offices is subject to judicial scrutiny for adherence to the Constitution.

### C.

■ Defendants also argue that plaintiff's claim is barred by the Speech or Debate Clause of the Constitution. U.S. Const. Art. I, § 6, cl. 1. Defendants argue that the Chaplains are "Officers of Congress" as defined in 2 U.S.C. § 60–1(b), and thus should be immune from suit. But, defendants themselves characterize the Clause as protecting "Members of Congress, and their aides, from being 'questioned' for any actions performed within the 'legitimate legislative sphere.'" House Chaplain's Mem. at 10 (quoting *Consumers Union of United States, Inc. v. Periodical Correspondents' Assoc.,* 515 F.2d 1341, 1350 (D.C.Cir.1975), *cert. denied,* 423 U.S. 1051, 96 S.Ct. 780, 46 L.Ed.2d 640 (1976) ). The Chaplains' prayers occur within the physical "legislative sphere"—on the floor of Congress—but this alone is not dispositive. The purpose of the Clause is to protect "activity integral to lawmaking." *Walker v. Jones,* 733 F.2d 923, 929 (D.C. Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984).

The practice of legislative prayer does not provide "meaningful input into ... legislative decisionmaking." *Davis v. Passman,* 544 F.2d 865, 880 n. 25 (5th Cir.1977), *revd. on other grounds,* 571 F.2d 793 (5th Cir.1978) (en banc), *revd.,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). Plaintiff convincingly supports his argument as to the nonlegislative character of the Chaplains' duties by pointing out that a quorum need not be present during the Chaplains' prayers. Stipulation of Senate Exhibits and Facts at ¶ 19 (filed Dec. 19, 1984); *see* 6 C. Cannon, *Precedents of the House of Representatives* § 663 (1936) (prayer by the Chaplain "is not a matter of business, but ... a matter of ceremony"). Moreover, plaintiff's claim challenges the "carrying out of [legislative] directions," e.g., the Chaplains' carrying out of House and Senate rules which circumscribe their conduct, not the process of legislative speech and debate which leads to the formulations of legislative directions. *Gravel v. United States,* 408 U.S. 606, 620–21, 92 S.Ct. 2614, 2624–25, 33 L.Ed.2d 583 (1972); *see Doe v. McMillan,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Kilbourn v. Thomp-*

*son,* 13 Otto 168, 103 U.S. 168, 26 L.Ed. 377 (1880). As such, plaintiff's claim is not barred by the Speech or Debate Clause.

### III.

### A.

### 1.

On the merits of Count I, defendants first question plaintiff's contention that the Chaplains, by allowing guest chaplains to give the opening prayer, have created a forum for expressive activity, an exclusion from which requires First Amendment scrutiny. Defendants argue that the Supreme Court decision in *Minnesota State Board, supra,* bars plaintiff's claim that he was discriminatorily denied permission to open a congressional session. In *Minnesota State Board,* community college faculty members challenged the constitutionality of a Minnesota statute which required public employers to "meet and confer" only with their professional employees' designated exclusive representative. Plaintiffs argued that the employer should listen to their views, as well as those of the exclusive representative. The Court held that plaintiffs had no right of access to the "meet and confer" sessions, and that the public employer had not created a "forum" for First Amendment purposes. According to the Court:

> "[m]eet and confer" sessions are occasions for public employers, acting solely as instrumentalities of the state, to receive policy advice from their professional employees. Minnesota has simply restricted the class of persons to whom it will listen in its making of policy. Thus, appellees' principal claim is that they have a right to force officers of the state acting in an official policymaking capacity to listen to them in a particular formal setting. The nonpublic forum cases concern government's authority to provide assistance to certain persons in communicating with other persons who would not, as listeners, be acting for the govern-

ment. As the discussion below makes clear, the claim that government is constitutionally obliged to listen to appellees involves entirely different considerations from those on which resolution of nonpublic forum cases turn.

104 S.Ct. at 1065 (footnote omitted).

It may be argued here that the Members of the House and Senate have "simply restricted the class of persons," *id.,* from whom they will receive a morning prayer. But in *Minnesota State Board,* the representative was chosen by the group of individuals as a whole to express a collective view.[2] Thus in *Minnesota State Board,* the class of persons entitled to speak, not the government, chose the one speaker. Here, Congress chooses its Chaplains and the Chaplains choose the guest chaplains. These speakers do not represent any collective American view of the proper content of prayer. Here also, the Chaplain is not speaking to the legislators in their "official policymaking capacity," *id.* at 1065, but is fulfilling the historical function of providing an opening prayer. *See* Part II, C, *infra.* Moreover, the Chaplains' prayers are published in the *Congressional Record* and compiled for public access. *See Kennickell, supra,* 622 F.Supp. at 1415. Thus, as well as communicating with legislators, the Chaplains speak to "other persons who would not, as listeners, be acting for the government." *Minnesota State Board,* 104 S.Ct. at 1065. Finally, the Courts in *Marsh* and *Murray* found it appropriate to inquire into the constitutionality of the content of the speech given in this particular forum. Because plaintiff's claim is arguably distinct from that presented in *Minnesota State Board,* it will be reviewed under the traditional First Amendment forum analysis.

### 2.

The Supreme Court has recognized three different types of fora for First Amendment expressive activity. The first type of forum is a place "which by long tradition or by government fiat ha[s] been devoted to

---

2. The State Board recognized, however, "that not every instructor agrees with the official fac-

ulty view on every policy question." *Id.* 104 S.Ct. at 1062.

assembly and debate ..." *Perry, supra,* 460 U.S. at 45, 103 S.Ct. at 954. In this type of forum, "the rights of the State to limit expressive activity are sharply circumscribed." *Id.* Plaintiff does not contend that the guest chaplain program constitutes a traditional public forum. Instead, in Count I of his complaint, plaintiff argues that through the guest chaplain program, both the House and Senate Chaplains have created a limited public forum.

■ A limited public forum "consists of public property which the State has opened for use by the public as a place for expressive activity." 460 U.S. at 45, 103 S.Ct. at 955. A limited public forum is one created "for a limited purpose such as ... for the discussion of certain subjects." *Id.* at 46 n. 7, 103 S.Ct. at 955 n. 7. In a limited public forum, although the government may limit access according to the designated subject matter, it cannot otherwise condition access on the content of the proposed speech unless it can demonstrate a compelling reason for doing so. *Id.* at 46, 103 S.Ct. at 955.

■ The creation of a limited public forum depends upon government intent. Where the government has not only limited access to a forum according to an articulated purpose, but also has consistently required government permission for access, the third type of forum, a nonpublic forum, is created. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* ——— U.S. ———, 105 S.Ct. 3439, 3450–51, 87 L.Ed.2d 567 (1985). In a nonpublic forum:

> [c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.... Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, ... or if he is not a member of the class of speakers for whose especial benefit the forum was created, ... the Government violates the First Amendment when it denies access to a

speaker solely to suppress the point of view he espouses on an otherwise includible subject.

105 S.Ct. at 3451.

■ Here, the permission of the appropriate Chaplain is required for an individual to appear as a guest chaplain either before the House or the Senate. Further, it appears that the Chaplains have consistently exercised discretion in choosing guest chaplains, most obviously by imposing the requirement that they say a prayer. Consequently, the forum created by the program is nonpublic. As such, distinctions as to guests need only be reasonable and viewpoint neutral. *Perry, supra,* 460 U.S. at 46, 103 S.Ct. at 955.

### 3.

Plaintiff argues that even if the guest chaplain program constitutes a nonpublic forum, the deliberate exclusion of nontheists constitutes unconstitutional viewpoint discrimination. Defendants do not question the fact that plaintiff was excluded from the forum because he would not invoke a deity. The issue is thus whether such a basis for exclusion constitutes unconstitutional viewpoint discrimination.

The Court in *Marsh* upheld the practice of the Nebraska legislature of beginning "each of its sessions with a prayer offered by a chaplain who is chosen biennially by the Executive Board of the Legislative Council and paid out of public funds." 463 U.S. 784–85, 103 S.Ct. 3332 (footnote omitted). The Court based its decision in part on the fact that "the practice of opening sessions *with prayer* has continued without interruption ever since th[e] early session of Congress." *Id.* at 788, 103 S.Ct. at 3334 (footnote omitted) (emphasis supplied). Moreover, the Court held that the Nebraska legislature could elect the same chaplain for 16 consecutive years without violating the Establishment Clause. The Court based this decision on evidence that the Chaplain was "acceptable to the body appointing him," *id.* at 793, 103 S.Ct. at 3336 (footnote omitted), and thus implicitly on

the fact that if he became unacceptable, he could be removed by the legislature. The Court noted that this chaplain "was not the only *clergyman* heard by the legislature; guest *chaplains* have officiated at the request of various legislators and as substitutes during [his] absences." *Id.* (emphasis supplied). The Court thus held that the Nebraska legislature could constitutionally choose, as a body, to limit the speech in the opening of legislative sessions to prayers by chaplains and clergymen for 16 consecutive years.

■ Here, the House and Senate have chosen the current Chaplains to open the legislative sessions. The Chaplains are required by House and Senate rules to say a prayer. Senate Rule IV; House Rule VII. The House and Senate have by these rules limited the subject matter of opening remarks to "prayer." The Supreme Court has held that a legislature may constitutionally choose to listen exclusively to prayer, as opposed to nonprayer, in the opening moments of each session. Although the choice between prayer and nonprayer appears to involve a choice between viewpoints, the Supreme Court has held that this particular forum may constitutionally be limited to prayer, and thereby sanctioned this particular viewpoint discrimination. Thus, in so limiting the expression in the forum, the Chaplains do not engage in unconstitutional viewpoint discrimination.

The Supreme Court decision in *Marsh* was based on a "unique history," *id.* at 791, 103 S.Ct. at 3335,[3] and as such, must be narrowly construed to minimize its apparent conflict with Supreme Court doctrine which firmly separates government from religion. *Community for Creative*

*Non-Violence v. Hodel,* 623 F.Supp. 528, 533–34 (D.D.C.1985), *emergency motion for injunction pending appeal denied,* No. 85–03861 (D.C.Cir. Dec. 23, 1985) (per curiam).[4] Despite this established Supreme Court doctrine, however, no narrowness of interpretation can avoid the fact that the Supreme Court in *Marsh* held that a legislature may choose to fill a publicly-paid forum exclusively with chaplains and clergymen, and almost exclusively with a chaplain representing one particular religious denomination. This is the law. As Justice Rehnquist has stated:

> Unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower courts no matter how misguided the judges of those courts may think it to be.

*Hutto v. Davis,* 454 U.S. 370, 375, 102 S.Ct. 703, 706, 70 L.Ed.2d 556 (1982). Plaintiff has failed to distinguish his claim from the issues decided in *Marsh.* The accompanying Order will grant defendants' motions for summary judgment as to Count I.

### B.

■ In Count II of plaintiff's complaint, plaintiff alleges that certain prayers offered by the Senate Chaplain overtly disparage non-theism and thus go beyond the bounds of *Marsh.* Plaintiff's argument that the Senate Chaplain's remarks go beyond the bounds of *Marsh* depends upon a caveat contained in that decision, which provides:

> [t]he content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or ad-

---

**3.** *See Wallace v. Jaffree,* —— U.S. ——, 105 S.Ct. 2479, 2494 & n. 4, 86 L.Ed.2d 29 (1985) (Powell, J., concurring) ("Only once since our decision in *Lemon, supra,* have we addressed an Establishment Clause issue without resort to its three-pronged test. *See Marsh....* In *Marsh* [,] ... [o]ur holding was based upon the historical acceptance of the practice, that had become 'part of the fabric of our society.'").

**4.** *See Everson v. Board of Education,* 330 U.S. 1, 16, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947), ("In

the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.'") (quoting *Reynolds v. United States,* 8 Otto 145, 164, 98 U.S. 145, 164, 25 L.Ed. 244 (1879) ); *see also Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 122–23, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1982); *School District of Abington Township v. Schempp,* 374 U.S. 203, 226, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963).

vance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

463 U.S. at 794–95, 103 S.Ct. at 3337. Plaintiff attaches as exhibits to his memorandum in support of his motion a number of the prayers which contain statements that he alleges disparage non-theism. Excerpts from these prayers provide:

Awaken us to the reality that to govern without God is to be a godless government and a godless government soon loses its concern for human rights, minorities and all people.

We are grateful for our legacy as a Nation.... Help us never to forget that this is fundamental to our system of values which would be nonexistent if our Founding Fathers had declared: "We hold these truths to be self-evident, that all men are descended from monkeys ...."

Father in Heaven, in a day when Godless forces would deny and destroy human rights, help us to see the futility in struggling to preserve them when we deny, privately and publicly, the God who gave them.

May we never ignore [the laws by which Thou dost govern the universe] without which there could be no science, no morality, no justice, nothing predictable or dependable in history.

Help us ... to realize that the God-factor is fundamental to our system, that if we refuse to be "governed by God," we will be ruled by tyrants.

May we understand that our rights are secure only as we take God seriously.

The liberties of a nation cannot be secure when belief in God is abandoned. Help us to see the futility of the struggle to preserve liberty when faith in God is forsaken.

Deliver us, righteous God from the self-deception which makes us think we can disregard Thy law and escape judgment. We pray in the name of the Holy One. Amen.

Plaintiff's Mem., Exs. 10–13, 15–18.

Plaintiff points out, correctly, that the Establishment Clause is meant to ensure government neutrality not only among religions, but between religion and nonreligion.[5] Consistent with this philosophy, plaintiff argues, the Supreme Court's statement in *Marsh* protects against "disparage[ment of] any ... belief," *Marsh*, 463 U.S. at 795, 103 S.Ct. at 3337, even the belief that there is no God or nonbelief on this subject.

Defendants make the preliminary argument that this claim is precluded by the decision of our Court of Appeals in *Murray*. After being directed to show cause why their complaint should not be dismissed in light of *Marsh*, plaintiffs in *Murray* made the identical argument advanced here, that the Senate Chaplain's remarks went beyond *Marsh* because they disparaged non-theism. The Court of Appeals nevertheless dismissed the action for want of a substantial constitutional question. But, one of defendants' arguments in *Murray* was that plaintiffs' new allegation went beyond the scope of the complaint and should be dismissed for that reason. Senate Chaplain's Mem. at 19 n. 15. The Court of Appeals in *Murray* thus did not clearly dispose of the issue presented here.

---

**5.** The Supreme Court stated:

At one time it was thought that this right [of the individual to choose his own creed] merely proscribed the preference of one Christian sect over another, but would not require equal respect for the conscience of the infidel, the atheist, or the adherent of a non-Christian faith such as Mohammedism or Judaism. But when the underlying principle has been examined in the crucible of litigation, the Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all." *Wallace, supra,* 105 S.Ct. at 2488 (footnotes omitted); *Everson, supra,* 330 U.S. at 15, 67 S.Ct. at 511 ("Neither [a state nor the Federal government] can pass laws which aid one religion, aid all religions, or prefer one religion over another."). *But see Wallace, supra,* 105 S.Ct. at 2509–20 (Rehnquist, J., dissenting).

On the merits, Count II of plaintiff's complaint raises serious constitutional concern. As the record now stands, however, ultimate disposition of this issue is also troublesome for a number of reasons. First, the Supreme Court's sanctioning of "invo[cation of] Divine guidance on a public body entrusted with making the laws," 463 U.S. at 792, 103 S.Ct. at 3336, and the Court's concomitant caveat against disparagement of other beliefs, suggest that the use of prayer by a Chaplain or a visiting Chaplain in the Congress to achieve political ends,[6] or the use of political argument to achieve religious objectives,[7] may exceed the bounds of *Marsh*.[8] An initial comparison of the prayers cited by plaintiff and the representative prayer before the Court confirms this distinction. The prayer in *Marsh* invoked a deity and quoted scripture, but did not link religious belief to political action. Other prayers before the Supreme Court in *Marsh*, however, are not in the record in this action and should be in order to confirm or dispel this apparent distinction.

As a second concern, the Chaplain here is accountable to the Senate, a coordinate branch of government. Although separation of powers concerns do not bar plaintiff's action, this controversy may be susceptible to disposition by Senate rule or action on an appropriate petition. *See Kennickell, supra,* 622 F.Supp. at 1418–20. Either process would allow the Legislative Branch an opportunity to define what it considers to be acceptable "prayer." Such a positive definition of "prayer" would provide greater guidance to present and future Chaplains than would a negative declaration by this Court. Moreover, parsing

particular prayers for their relative disparaging content is "sensitive," *id.* 463 U.S. at 795, 103 S.Ct. at 3337, and would intimately entangle the Court with subjective evaluations of a religious nature, thereby creating exactly the climate for religious tension that the Establishment Clause is intended to prevent. *See Lemon, supra,* 403 U.S. at 612–13, 91 S.Ct. at 2111. Resolution of this controversy without such entanglement is therefore to be preferred. The Court thus far, however, has received no indication that the Senate is willing to consider the issue. *See Kennickell, supra,* 622 F.Supp. at 1418–20.

Finally, plaintiff's proposed relief is troublesome in that he seeks a prior restraint—an injunction against all present and future Chaplains—as a remedy for the alleged First Amendment violation. But the remedy itself may pose First Amendment concern. *See Organization For A Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). For this reason also, a positive definition of "prayer," as opposed to a negative restraint, would most effectively resolve the present action.

Accordingly, it is appropriate to hear further argument on Count II. The accompanying Order will set oral argument for a date certain, at which the parties should be prepared to address the above concerns, particularly the prospects for relief by rule or petition. *Compare Kennickell, supra,* 622 F.Supp. at 1420 *with Gregg v. Barrett,* 771 F.2d 539, 543–46 (D.C.Cir.1985). The Order will also direct the parties to file on

---

6. E.g., "to govern without God is to be a godless government and a godless government soon loses its concern for human rights, minorities and all people." Plaintiff's Mem., Ex. 10.

7. E.g., "Help us ... to realize that the God-factor is fundamental to our system, that if we refuse to be 'governed by God,' we will be ruled by tyrants." Plaintiff's Mem., Ex. 15.

8. *See Wallace, supra,* 105 S.Ct. at 2497 (O'Connor, J., concurring) (quoting her concurrence in *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355,

1366, 79 L.Ed.2d 604 (1984) ) ("[T]he religious liberty protected by the Establishment Clause is infringed when the government makes adherence to religion relevant to a person's standing in the political community. Direct government action endorsing religion or a particular religious practice is invalid under this approach because it 'sends the message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.' ").

the record in this action all prayers before the Supreme Court in *Marsh.*