**Mimi CUTLER, Stephen D. Annand, National Council of Senior Citizens, Plaintiffs,**

v.

**Dr. Arthur Hull HAYES, Jr., Commissioner, Food and Drug Administration, Richard S. Schweiker, Secretary, Department of Health and Human Services, Defendants,**

**The Proprietary Association, Inc., Intervenor-Defendant.**

**Civ. A. No. 81–2092.**

United States District Court, District of Columbia.

Nov. 3, 1982.

William B. Schultz, Katherine A. Meyer, Public Citizen Litigation Group, Washington, D.C., for plaintiffs.

Jeffrey N. Gibbs, Asst. U.S. Atty., U.S. Dist. Court, Washington, D.C., for defendants.

Robert A. Altman, Washington, D.C., for intervenor-defendant.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

This case represents another engagement in the war being waged by several public interest groups against the Food and Drug Administration ("FDA") over the adequacy of its regulation of the over-the-counter ("OTC") drug market. Plaintiffs are Mimi Cutler and Stephen Annand, individuals who claim that they are consumers of OTC drugs, and the National Council of Senior Citizens ("NCSC"), on behalf of its members who use OTC drugs. The defendants are Arthur Hayes, Commissioner of the Food and Drug Administration; Richard Schweiker, Secretary of the Department of Health and Human Services (collectively, "FDA"); and The Proprietary Association, Inc. ("PA"),[1] a trade association whose members manufacture OTC drugs. The

---

1. The Proprietary Association was permitted to intervene.

complaint alleges that certain FDA regulations concerning the "OTC review" referred to *infra* violate the Federal Food, Drug, and Cosmetic Act, *as amended* ("FDC Act"), 21 U.S.C. § 301 *et seq.* (1976) and this Court's prior decision in *Cutler v. Kennedy,* 475 F.Supp. 838 (D.D.C.1979) which began as *Health Research Group v. Kennedy,* Civil Action No. 77–0734, and survived dismissal on standing grounds, 82 F.R.D. 21 (D.D.C. 1979), by adding the same individual plaintiffs. Plaintiffs also allege that the FDA has abdicated its statutory duty to enforce the FDC Act against manufacturers who sell OTC drugs which fail to meet the Act's standards and that the FDA's failure to complete its OTC review constitutes an "unreasonable delay" in violation of the Administrative Procedure Act, 5 U.S.C. §§ 555(e), 706(1). The original parties have filed cross-motions for summary judgment, and the intervenor-defendant has filed a motion for judgment on the pleadings. The intervenor has also moved to dismiss on grounds that the plaintiffs lack standing and have failed to exhaust administrative remedies.

*Standing and Exhaustion of Remedies*

The PA claims that the plaintiffs are sham participants in this action, solicited by Public Citizen and the Health Research Group to permit them to maintain a suit otherwise barred by the decision in *Health Research Group v. Kennedy,* 82 F.R.D. 21 (D.D.C.1979). The Court finds it unnecessary to become embroiled in the continuing controversy between these parties over the standing of consumer groups, because it concludes that the issue was decided in *Cutler v. Kennedy,* and the PA is collaterally estopped to challenge the standing of plaintiffs Cutler and Annand.

**2.** Because the Court concludes that Cutler and Annand have standing, it is unnecessary to determine whether the NCSC also has standing to maintain the lawsuit.

**3.** In *Montana v. United States,* the court indicated that the doctrine of collateral estoppel might not be applicable where "controlling facts or legal principles" have changed since the first judgment. 440 U.S. at 155, 99 S.Ct. at 974. The PA argues that they have presented

The doctrine of collateral estoppel provides that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). It precludes parties from contesting matters already fully litigated, protects their adversaries from the burdens attending multiple lawsuits, conserves judicial resources, and minimizes the risk of inconsistent decisions, *Id.,* at 153–54, 99 S.Ct. at 973–74, and these purposes are equally served when the doctrine is applied to jurisdictional questions as to the merits. *American Surety Co. v. Baldwin,* 287 U.S. 156, 53 S.Ct. 98, 77 L.Ed. 231 (1932); *Miller v. Saxbe,* 396 F.Supp. 1260 (D.D.C.1975); *Zoriano Sanchez v. Caribbean Carriers, Ltd.,* 552 F.2d 70 (2d Cir.1977). Cutler, Annand, and the PA were all parties to the prior proceeding.[2] The only remaining inquiry is whether the issue presented in the two proceedings is substantially the same. *Schneider v. Lockheed Aircraft Corp.,* 658 F.2d 835, 852 (D.C.Cir.1981).

In *Cutler v. Kennedy* plaintiffs challenged the continued marketing of certain OTC drugs which had not been affirmatively shown to meet the FDC Act's standards. Their standing derived from their increased risk of exposure to drugs which were substandard. 475 F.Supp. at 848. In this case the plaintiffs allege that the regulations as revised following the decision in *Cutler* have not alleviated that exposure risk. The parties and the threatened injury being the same in both cases, the standing issue is identical and was conclusively determined in the prior proceeding.[3]

new evidence to the Court tending to support their claim that the individual plaintiffs are merely nominal parties being used as a facade for the suit by Public Citizen and HRG. Without deciding the issue again, the Court notes that the PA has not introduced any evidence to refute the essential factual predicate underlying the standing decision in *Cutler v. Kennedy,* viz., that the individual plaintiffs consume OTC drugs and would be exposed to an increased

■ Intervenor-defendant PA also argues that plaintiffs have failed to exhaust their administrative remedies. This action, however, is ancillary to *Cutler v. Kennedy* and is, in essence, a suit to vindicate plaintiffs' limited victory there to which, they assert, the FDA has been less than amenable beyond revising the disputed regulation. The FDA did not raise the exhaustion issue in *Cutler* and has not raised it here. Assuming without deciding that it is an issue which can be raised by PA when waived by the agency itself, it is patently clear that the FDA does not concede plaintiffs are entitled to relief they seek now whether at the FDA or in this Court. In these circumstances resort to the agency would be not only futile but wasteful as well. *See Mathews v. Diaz,* 426 U.S. 67, 76, 96 S.Ct. 1883, 1889, 48 L.Ed.2d 478 (1976); *Natural Resources Defense Council v. Train,* 510 F.2d 692, 703 (D.C.Cir.1975).

*The FDA Regulations*

The statutory scheme under which the FDA regulates the nation's drug markets was set out in detail by the court in *Cutler v. Kennedy,* and a synopsis will suffice here.

The Federal Food, Drug, and Cosmetic Act of 1938, established a premarketing license system only for "new drugs," defined in the original act as those not generally recognized by qualified experts as safe for their intended use. Prior to marketing a new drug, the manufacturer is required to submit a "new drug application" ("NDA") for approval by the FDA. 21 U.S.C. § 355(a). The Drug Amendments Act of 1962 expanded the scope of this premarketing clearance by redefining a "new drug" as one not generally recognized

health risk by the marketing of products which may not be safe or effective, as distinguished from evidence tending to confirm their suspicion that the litigation is being prosecuted with minimal direction from or participation by plaintiffs themselves. Indeed, organizations have frequently prosecuted "test cases" to vindicate a perceived public interest by recruiting representative parties to confer standing the organizations themselves did not possess. *See N.A.A.C.P. v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

being as both safe *and effective* for its intended use. 21 U.S.C. § 321(p). By definition, therefore, any drug which *is* generally recognized as safe and effective ("GRAS/E") is not a new drug and is exempt from the NDA requirement. *Cutler v. Kennedy,* 475 F.Supp. at 841.

Although the FDC Act provides for the imposition of substantial penalties upon a producer who sells a "new drug" without an NDA, the Act does not require any administrative determination of a drug's status prior to its introduction into the marketplace. A manufacturer who concludes that his drug meets the GRAS/E requirements[4] customarily distributes the product without first seeking FDA approval—whether he does so lawfully depends, of course, upon whether it is, in fact, GRAS/E. The vast majority of OTC drugs are marketed in this manner.

The 1962 amendments also contained transitional provisions for drugs placed on the market since 1938 and mandated an FDA review of all drugs covered by NDAs,[5] although no corresponding review of GRAS/E products was required. In 1972, however, the FDA announced that it would, on its own initiative, begin a comprehensive review of OTC drugs to establish "conditions" under which they could be lawfully marketed. 37 Fed.Reg. 85 (Jan. 5, 1972). In lieu of reviewing the estimated 100,000–500,000 OTC products individually for safety and effectiveness, the agency decided it would focus on the seven hundred or so active ingredients used in all OTC drugs and, through rule-making, promulgate "monographs" stating the conditions under which the particular ingredients can be recognized as GRAS/E. 37 Fed.Reg. 9464 (May 11, 1972).

4. In *Weinberger v. Hynson, Wescott and Dunning,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973), the Supreme Court held that the GRAS/E standard requires at least a showing of "substantial evidence" of effectiveness.

5. *See American Public Health Association v. Veneman,* 349 F.Supp. 1311 (D.D.C.1972).

The OTC review proceeds in four steps. In the first, now completed, advisory panels of experts analyzed test data and submitted their recommendations to the FDA in the form of a monograph establishing permissible use and labeling standards for each drug, 21 C.F.R. § 330.10(a)(5), the process having taken each panel anywhere from four to seven years to complete. Next, the FDA reviews each monograph and publishes it in the Federal Register for public comment and the submission of additional information concerning a product's safety and effectiveness. 21 C.F.R. § 330.10(a)(6). In the third stage, after reviewing the comments submitted, the FDA publishes a tentative final monograph ("TFM") and provides the public with opportunity to file objections to the TFM or to request an oral hearing. 21 C.F.R. §§ 330.10(a)(7), 330.-10(a)(8). No additional data or information concerning a drug's effectiveness may be submitted to the agency at this point, however, unless the FDA grants a petition to reopen the record. 21 C.F.R. § 330.-10(a)(10)(ii). Finally, the FDA reviews the entire administrative record and issues a final monograph ("FM"), the agency's conclusive and legally binding determination regarding the conditions under which a drug is GRAS/E.

While the review was underway the FDA devised a system of administrative triage to assign a drug to one of three categories. Category I drugs were those which met conditions under which they would be GRAS/E. In Category II were those which did not. Category III drugs were those for which the available data was insufficient to make a determination either way. *See* 21 C.F.R. §§ 330.10(a)(5) (1978). When the FDA adopted a regulation which purported to authorize the continued marketing of Category III drugs after the issuance of a final monograph, 21 C.F.R. § 330.10(a)(13) (1978), however, two public interest organizations, Public Citizen ("PC") and the Health Research Group ("HRG"), brought suit challenging the regulation. The court found that PC and the HRG lacked standing to bring the action, but permitted the substitution of three individual plaintiffs— two of whom, Cutler and Annand—are also plaintiffs in this case. *Health Research Group v. Kennedy,* 82 F.R.D. 21 (D.D.C. 1979). With the case so reconstituted the court ultimately ruled that the regulation purporting to allow the marketing of Category III drugs violated the FDC Act which, except for new drugs subject to NDAs, required that only safe and effective drugs should reach the market. In purporting to "affirmatively sanction" the sale of OTC drugs which it had yet to determine were GRAS/E, the court held, FDA had exceeded its statutory authority. *Cutler v. Kennedy,* 475 F.Supp. at 854. The court refused to order the agency to remove all Category III drugs from the shelves as the plaintiffs requested, however, because the FDC Act vested the FDA with considerable prosecutorial discretion as to when and how to proceed against unlawfully marketed products. *Id.* at 856–57.

Following the decision in *Cutler v. Kennedy* the FDA initiated rule-making proceedings[6] and has now published its final, revised Category III regulation in the Federal Register. 46 Fed.Reg. 47730 (September 29, 1981). The new regulation deletes the language which represented the FDA's attempt to exempt Category III drugs from enforcement actions. It also provides that, after the publication of the TFM (which now includes only Category I conditions),[7] the administrative record will remain open for twelve months, during which time any

---

6. A proposed rule was published on May 13, 1980. Fed.Reg. 31422 (1980). This suit was commenced on September 3, 1981 and requested, *inter alia,* that the FDA be directed to issue a final Category III regulation. The final rule was issued by the FDA on its own initiative one month later and plaintiffs were granted leave to amend the complaint to include a substantive challenge to the regulation.

7. The agency has indicated that to the extent possible, prior to issuing the TFM it will inform drug manufacturers when it reaches a tentative decision that additional information is needed to establish GRAS/E status. 47 Fed.Reg. 47740.

interested person may submit evidence to support inclusion of a drug in the monograph. 21 C.F.R. § 330(a)(7)(iii) (1982); 46 Fed.Reg. 47738. Final monographs will similarly include only Category I conditions. 21 C.F.R. § 330.10(a)(9) (1982); 47 Fed.Reg. 47738.[8]

The plaintiffs contend that the revised regulations still violate the FDC Act, because they still permit the marketing of products which are not GRAS/E. They assert that the interim one-year testing period merely delays final administrative action and camouflages the FDA's intention to sanction the continued distribution of Category III products irrespective of the language change.

■■ *Cutler v. Kennedy* invalidated the FDA's OTC regulations only because they "formally authorize[d] the continued marketing of Category III drugs in the absence of an administrative determination that those products are [GRAS/E]," and, moreover, purported to do so in perpetuity: "[p]roducts placed in Category III may therefore be marketed indefinitely so long as the manufacturer agrees to perform the required testing." 475 F.Supp. at 854, 846. Under the revised regulations, however, Category III products are no longer exempt from enforcement actions merely by being such, and the agency retains the discretionary authority to invoke the forfeiture and penalty provisions of the FDC Act, 21 U.S.C. §§ 331–334, against any product which it determines is not GRAS/E. Such action may be taken after the agency publishes a proposed monograph, a tentative monograph, or even during the interim testing period. Before the final monograph issues, the manufacturers of Category III products do so at their peril not only as to civil liability but as to FDA enforcement proceedings as well.

The FDA contends that the testing period is necessary because under the old regulations, the administrative record closed with respect to submission of additional information concerning a drug's effectiveness after the comment period following publication of the tentative monograph. 45 Fed.Reg. 31423 (May 13, 1980). *See* 21 C.F.R. § 330.10(a)(10)(i) (1978). Any party wishing to submit new data after that stage was required to petition for a formal re-opening of the administrative record, 21 C.F.R. § 330.10(a)(10)(ii) (1978), a situation occurring with some frequency as manufacturers responded to agency testing guidelines and requests for additional information. 45 Fed.Reg. 31423 (1980). The FDA claims that the revised regulations will eliminate the need to make an individual review of each of these petitions and, thus, prevent the immense drain on agency resources it entails. In addition, the FDA has stated that the interim testing period is unlikely to delay issuance of the final monograph, because the agency will conduct its review of the entire administrative record (in preparation for issuing the final monograph) concurrently with the running of the time permitted for the submission of new data. 46 Fed.Reg. 47733 (1981).

The standard for review of agency rulemaking is a narrow one. The Court is not authorized to substitute its judgment for that of the agency, *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), but may determine only whether the regulations are arbitrary, capricious, or not in accordance with law. APA, 5 U.S.C. § 706(2)(A); *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The FDA has removed the offending language from the regulation and has proffered a reasonable justification for the interim testing period based on administrative necessity. *See Ashland Exploration, Inc. v. FERC,* 631 F.2d 817 (D.C.Cir.1980). The court concludes that the FDA has complied with *Cutler v. Kennedy* and that its regulations now conform to the FDC Act.

---

**8.** The FDA is also revising its terminology to eliminate the terms Category I, II, and III from the final monograph: a drug which is GRAS/E will now be termed a "monograph condition," while all others will be referred to as a "non-monograph condition," regardless of the reason for their exclusion from the former. 47 Fed. Reg. 47736–37.

## Non-Enforcement

■ Although they ask for no specific form of relief, plaintiffs allege that the FDA has adopted (and made known to the industry) a policy of non-enforcement against OTC drugs pending completion of the review which, plaintiffs assert, amounts to an implied promise of immunity for an indefinite and protracted future. They say that the FDA has "virtually abandoned" its obligation under the FDC Act to police the OTC drug market against unsafe or ineffective drugs, and, on analogy to *Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir.1973), urge this Court to order the FDA to fulfill its statutory duty. They remark that OTC drugs have been sold since 1962 without premarketing clearance from the agency, the public's only assurance of their safety and efficacy for some 20 years having been essentially the manufacturers' good faith.

Plaintiffs' description of the policy, however, is considerably more dogmatic than the several statements appearing in FDA documents they proffer as the evidence to support it which are qualified in context to the point where they simply do not do so. Moreover, the affidavit of the acting director of the FDA's division responsible for both review and enforcement with respect to OTC drugs states that, even as the review proceeds, the FDA has taken enforcement against OTC drugs which present health hazards or are adulterated and lists 17 "illustrative" enforcement proceedings since 1972 ranging from seizure through class action litigation to inducing informal voluntary withdrawal from the market.[9] In the circumstances the Court finds that the FDA has not adopted a policy of total non-enforcement and concludes that such enforcement as has been undertaken indicates a reasonable exercise of the prosecutorial discretion the FDA was acknowledged to possess in *Cutler v. Kennedy,* 475 F.Supp., at 856.

## Unreasonable Delay

■ Plaintiffs state that the FDA's self-initiated OTC review, begun in 1972, has been in process for a decade without substantial progress and promises to continue for perhaps another, or even longer. All the while, plaintiffs say, non-GRAS/E drugs are being offered to an unsuspecting public who believe, erroneously, that the FDA has screened them. Plaintiffs cite a number of cases, most notably *Nader v. FCC,* 520 F.2d 182 (D.C.Cir.1975), as authority for this Court to direct the FDA to complete its OTC review by a date certain, or at least to impose a schedule for its completion, pursuant to the Administrative Procedure Act, 5 U.S.C., § 706(1), as "agency action ... unreasonably delayed."

In each of plaintiffs' cases, however, the action sought to be compelled had been mandated by statute, whereas the FDA's OTC review was voluntarily undertaken as one of several approaches of which it might have availed itself, in its discretion, in discharging its statutory duty with respect to all drugs. Indeed, in confirming the scope of the agency's discretion in relation to new drug applications, the Supreme Court acknowledge the difficulty of (and implicitly approved) the OTC review procedure as an elective alternative to another (case-by-case enforcement), *Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 650, 93 S.Ct. 2488, 2492, 37 L.Ed.2d 235 (1973), while holding in a companion case, *Weinberger v. Hynson, Wescott & Dunning,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 307 (1973) that adequate and well controlled studies were to be the basis of a general recognition of safety and effectiveness. *Id.,* at 629–30, 93 S.Ct. at 2483.

If the "... enormously complicated, uncertain, and evolving technology ..." of *mandatory* scientific testing of 23 food color additives for safety alone (being conducted by the industry itself in deference to the FDA's own finite resources) could lawfully

---

**9.** The parties disagree as to whether the list is merely "illustrative" or comprehensive, but the dispute is immaterial. The Court notes parenthetically, for historical context, that as this decision is being written the FDA's enforcement resources are being devoted to the protection of the public from lethal substances in various OTC drugs which were *not* placed there by the manufacturers.

be protracted for 24 years, as the Court of Appeals has recently held in *McIlwain v. Hayes,* 690 F.2d 1041, 1049 (D.C.Cir.1982), it can hardly be said that a voluntary testing program of over 700 active ingredients contained in various combinations in more than 300,000 OTC drug products for effectiveness as well as safety might not reasonably be expected to take at least as long. In any event the record before this Court does not permit the conclusion that plaintiffs would have it draw, i.e., that defendants have abused their discretion in allowing it to do so.

For the foregoing reasons it is, this 3rd day of November, 1982,

ORDERED, that the intervenor-defendant's motion to dismiss is denied; and it is

FURTHER ORDERED, that defendants' motion for summary judgment and intervenor-defendant's motion for judgment on the pleadings (treated in accordance with Fed. R.Civ.P. 12(c)) are granted.