**Dr. Paul KURTZ, Plaintiff,**

**v.**

**James A. BAKER, Secretary of the Treasury, et al., Defendants.**

**Civ. A. No. 84–2919.**

United States District Court, District of Columbia.

Aug. 22, 1986.

Order Sept. 11, 1986.

Ronald A. Lindsay, Washington, D.C., for plaintiff.

Steven R. Ross, Gen. Counsel to the Clerk, Michael L. Murray, Asst. Counsel to the Clerk, U.S. House of Representatives, Washington, D.C., for defendant Chaplain Ford.

Michael Davidson, Senate Legal Counsel, Ken U. Benjamin, Jr., M. Elizabeth Culbreth, Morgan J. Frankel, John C. Grabow, Washington, D.C., for defendant Senate Chaplain Halverson.

Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. DiGenova, U.S. Atty., Sandra M. Schraibman, Stephanie L. Golden, Attys., Dept. of Justice, Washington, D.C., for defendants Baker and Ortiz.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiff, Dr. Paul Kurtz, is a professor of philosophy and a secular humanist. Defendants are the Secretary of the Treasury, the Treasurer of the United States, the Chaplain of the House and the Chaplain of the Senate.

Plaintiff brings this suit requesting a permanent injunction to restrain all present and future chaplains of the United States Senate and House of Representatives, while acting in their official capacity, from disparaging the beliefs of nontheists, and a declaration that the making of such remarks by a Senate or House chaplain is unconstitutional. In the alternative, plaintiff seeks the termination of federal funding of the chaplaincies.

This case, now before this Court a second time, is in a somewhat unusual posture. To understand its posture, it is necessary to review the events leading to the present. The controversy began in February 1984, when plaintiff wrote to the Senate and House Chaplains, requesting permission to participate in the informal "guest chaplain program," whereby speakers were occasionally invited to stand in for the chaplain and give the opening remarks and prayer before members of Congress. Plaintiff stated in his application letters that his remarks would not invoke a deity. Both Chaplains rejected plaintiff's request, stating as one of their reasons that plaintiff would not offer a prayer during his remarks. That summer, plaintiff also had occasion to review some of the prayers of the Senate Chaplain. Plaintiff discovered several prayers in which the Senate Chaplain had, in his opening prayers before the Senate, allegedly disparaged the beliefs of nontheists.

Complaining about his exclusion from the guest chaplain program, and the content of some of the Senate Chaplain's prayers, plaintiff filed suit on September 19, 1984. Count I alleged that the guest chaplain program discriminatorily excludes nontheists in violation of the Free Speech, Free Exercise, and Establishment Clauses of the First Amendment, and the Due Process Clause of the Fifth Amendment, of the United States Constitution. Plaintiff sought to enjoin the allegedly discriminatory practice and a declaration that the practice is unconstitutional. In the alternative, plaintiff sought termination of federal funding of the House and Senate chaplaincies. Count I was dismissed by Order filed March 11, 1986. *Kurtz v. Baker,* 630 F.Supp. 850 (D.D.C.1986).

In Count II, plaintiff raised the claim now at issue. Plaintiff alleged that the Senate Chaplain "has routinely used his opening remarks as a vehicle for disparaging the beliefs of non-theists ..." Complaint at ¶ 44 (filed Sept. 19, 1984). Plaintiff alleged that the Senate Chaplain's remarks violate the Establishment Clause of the First Amendment, and sought the same relief requested in Count I.

In turn, defendants challenged plaintiff's right to bring the suit, arguing that plaintiff lacked standing to raise his claims, that his challenges presented nonjusticiable political questions, and that his action was barred by the Speech and Debate Clause of the Constitution, U.S. Const. Art. I, § 6, cl. 1. Each of these jurisdictional challenges was rejected for reasons stated fully in 630 F.Supp. 850. Defendants also moved for summary judgment on Count I, contending that the Supreme Court opinion in *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), foreclosed further judicial inquiry into the constitutionality of

the guest chaplain program, and compelled a decision in defendants' favor.

Defendants' motion for summary judgment on Count I was granted. Resolution of Count II, however, in which plaintiff challenged the allegedly disparaging prayers of the Senate Chaplain, was postponed to permit further briefing. While *Marsh v. Chambers* spoke broadly to the constitutionality of the legislative chaplaincy, the Supreme Court failed to address what limits, if any, the Constitution places on the content of the chaplain's prayers. But the Court's opinion, generally upholding the constitutionality of legislative chaplaincies, does contain a caveat from which one might fairly infer that the Senate Chaplain may not use his official government position to disparage the beliefs of nontheists and that judges would have concern and jurisdiction in such a case. That caveat states:

> The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

463 U.S. at 794–95, 103 S.Ct. at 3337–38.

To demonstrate the extent and nature of the Senate Chaplain's disparagement, plaintiff attached as exhibits several excerpts from prayers spoken by the Chaplain. These excerpts are more fully set out in this Court's earlier opinion, 630 F.Supp. at 860. Three examples follow:

> Awaken us to the reality that to govern without God is to be a godless government and a godless government soon loses its concern for human rights, minorities and all people.

> \* \* \* \* \* \*

> We are grateful for our legacy as a Nation.... Help us never to forget that this is fundamental to our system of

values which would be nonexistent if our Founding Fathers had declared: "We hold these truths to be self-evident, that all men are descended from monkeys...."

> \* \* \* \* \* \*

> Help us ... to realize that the God-factor is fundamental to our system, that if we refuse to be "governed by God," we will be ruled by tyrants.

Noting that the Establishment Clause is meant to ensure government neutrality not only among religions, but between religion and nonreligion, the Court remarked that these prayers raise "serious constitutional concern," 630 F.Supp. at 861, but postponed resolution of Count II because the then record did not permit adequate consideration of material issues, including the implications of the caveat in *Marsh*, and the prospects of Congressional clarification of the proper content of the Senate Chaplain's prayers. Since that time, there have been several intervening events of importance.

At a March 26, 1986 hearing, Senate Legal Counsel (and counsel for the Senate Chaplain) indicated that he had brought this matter to the attention of Senator Charles M. Mathias, Jr., Chairman of the Senate Committee on Rules and Administration, and discussed with him "whether ... consideration of a Senate rule affirmatively defining prayer would be a fruitful and proper undertaking."[1] That discussion failed to resolve the matter. Explaining the Senate's hesitancy to act, counsel stated that "[t]he difficulty with a formal rule is that it would embroil the Senate" in a debate on "the meaning of prayer and the appropriate parameters of prayer.... It is an undertaking which has never been done and just the thought of it elicits great concern that the very kind of divisiveness that the First Amendment seeks to avoid would be the inevitable product of such a debate." Because of the difficulty and sen-

---

1. Quotations are taken from a tape recording of the hearing. The hearing has not yet been officially transcribed.

sitivity of defining the appropriate parameters of prayer, counsel reported to the Court that the prospects for relief by rule or petition are not good. A preferable way to resolve this dispute, Senate counsel proposed, would be to have Senate Chaplain Reverend Richard C. Halverson and Dr. Kurtz sit down together and deal directly. Referring to Reverend Halverson's eagerness not to offend, counsel stated: "It doesn't take a rule and it doesn't take a policy for people to adjust to criticism."

Plaintiff explained, however, that the controversy is not a personal one between Reverend Halverson and Dr. Kurtz. Plaintiff seeks to guard against disparagement not only by Reverend Halverson, but by future chaplains as well, and requests some form of relief that is more certain and durable than the memory of a private meeting with the present Chaplain. Plaintiff also contends that Senate guidance to the Chaplain concerning the proper content of prayer would not embroil it in divisive debate, or affront First Amendment concerns. Plaintiff points to the events of 1969. In that year, a special bipartisan Committee on the Status of the Senate Chaplain completed a study to determine policy for the Office of the Senate Chaplain. Concerned that the Chaplain refrain from using his forum to engage in political expression, Senators Mike Mansfield and Everett Dirksen, acting as majority and minority leaders of the United States Senate and speaking on behalf of the Committee, wrote to Senate Chaplain Edward L.R. Elson and cautioned him against using his prayer opportunity for political comment.[2] This incident demonstrates, says plaintiff, recognition by the Senate of the necessity and appropriateness of Senate guidance, even in matters touching the content of prayer.

Even though Senate guidance is appropriate, plaintiff argues, Senate involvement is not necessary to resolution of this case. The Office of the Chaplain can take steps on its own. At the March 26 hearing, plaintiff explained:

> In the record in this case already there is an official release from the office of the Senate Chaplain, talking about what the chaplain does, and the guest chaplaincy, and what have you. It seems to me that one way to dispose of this case ... is if in future releases similar to that there would be an indication that the prayer opportunity is not used to disparage the beliefs of others, including the beliefs of the nonreligious. That would be one sentence inserted in this release from the Office of the Senate Chaplain. I don't think that could be plausibly characterized as any kind of intrusion into [the Senate's affairs].

Following the status conference in March, an exchange of letters occurred between Reverend Halverson and Dr. Kurtz. This correspondence, set out in the appendix, is composed of two sets of exchanges from March 27 to May 8, 1986. Reverend Halverson initiated the exchange. The correspondence suggests that both men have grappled with the other's concerns with sympathy and in good faith. Reverend Halverson, in his letter dated April 24, states that "[d]isparagement was the farthest thing from my mind.... I not only regretted that disparagement had been communicated, but have tried subsequently to guard against such a possibility."

On May 1, 1986, after Reverend Halverson's second letter, Defendant Senate Chaplain ("Defendant") filed a renewed motion to dismiss, requesting two forms of relief. Memorandum of Defendant Senate Chaplain in Support of Renewed Motion to Dismiss (filed May 1, 1986) ("Defendant's Renewed Motion"). First, defendant requests that plaintiff's suit be dismissed because "the controversy has now become too attenuated to justify the extraordinary relief sought through equity's intervention." Defendant's Renewed Motion at 2 (quoting

---

**2.** The letter states in part: "The Chaplain is responsible for avoidance in his own prayers, and in the prayers of guest Chaplains, of the injection of political partisanship and personal points of view respecting contemporary national and international issues." Supplement to Senate Exhibits, Senate Ex. 6 (letter of February 7, 1969).

*De Arellano v. Weinberger*, 788 F.2d 762, 764 (D.C.Cir.1986) (en banc) (per curiam)). Defendant also requests that, upon dismissing the suit, the Court vacate its prior jurisdictional holdings in Count II. Defendant's Renewed Motion at 7. *See Kurtz v. Baker*, 630 F.Supp. 850 (D.D.C.1986). Argument on defendant's renewed motion was held on June 18, 1986. For reasons set out below, defendant's motion to dismiss and motion to vacate are granted.

### I.

■ Defendant Senate Chaplain contends that the exchange of letters between himself and Dr. Kurtz, his enlightenment, and his intent "to guard against" making further disparaging remarks, render the present dispute too attenuated to warrant exercise of the Court's extraordinary powers of equity. Defendant cites *Community for Creative Non-Violence v. Hess*, 745 F.2d 697 (D.C.Cir.1984) in support.

In *Hess*, plaintiffs brought suit asserting that District of Columbia Superior Court judges violated the Free Exercise Clause by requiring everyone to stand when a judge enters and leaves the courtroom. Unbeknownst to the judges, such displays of respect were contrary to the plaintiffs' religious convictions. Upon being informed that the judges would accommodate the religious beliefs of plaintiffs, the District Court dismissed the suit and the Court of Appeals affirmed, the latter court explaining that even though the case was not technically moot, "the wholesome considerations underlying the Article III case-or-controversy requirement" counsel against resolution of constitutional issues if avoidable. 745 F.2d at 700 (footnote omitted). The Court stated: "[T]he likelihood of recurrent confrontations ... is much too small to warrant decision of the issue...." 745 F.2d at 701.

Defendant, drawing parallels to *Hess*, explains that "[a]s 'the judges [in *Hess*] have volunteered to reconcile their needs for re-

spect and order in the courtroom with [the *Hess* plaintiffs'] religious dictates,' so Dr. Halverson has volunteered to Dr. Kurtz that he understands Dr. Kurtz's concerns and that he intends to guard against the possibility that disparagement might be perceived in his prayers." Defendant's Renewed Motion at 6–7. In these circumstances, defendant concludes, injunctive or declaratory relief is unwarranted.

Withholding extraordinary relief is even more appropriate here than in *Hess*, defendant argues, because of the existence of the letters, which embody the Senate Chaplain's promise to guard against disparagement. Written on official stationary, Reverend Halverson's letters will be preserved, along with the letters of Dr. Kurtz, in the legislative record division of the National Archives, pursuant to 2 U.S.C. § 288g(b). Also, Reverend Halverson, through counsel, has promised to maintain a copy of the correspondence in the office of the Senate Chaplain so that it will be available to his successor and to future chaplains.[3]

In response, plaintiff emphasizes the Senate Chaplain's unwillingness to adopt a formal policy against disparagement. "It would have been easy enough for the office of the Senate Chaplain to adopt a policy to the effect that 'the Senate Chaplain is to avoid remarks which advance or disparage any particular faith or belief.' Such a policy statement," plaintiff says, "could have been embodied in the release distributed by the Senate Chaplain's office ... without causing the slightest embarrassment to that office. The refusal to take even this simple step, belies the contention that [future disparagement] 'is much too small to warrant decision of the issue.'" Plaintiff's Response to the Senate Chaplain's Renewed Motion to Dismiss ("Plaintiff's Response"), at 3–4 (filed April 12, 1986) (quoting *Hess*, 745 F.2d at 701). Plaintiff concludes, "If the institution of the Senate Chaplaincy is unable or not disposed to

---

3. Statement of counsel for Senate Chaplain, June 18, 1986 hearing. This hearing has not yet been officially transcribed.

commit itself to following a constitutionally sound course, then there is no alternative but to ask the Court's assistance." Plaintiff's Response at 4 (footnote omitted).

Though constitutional concerns persist with respect to defendant's official re-marks, the Court is persuaded that the balance of considerations counsel against resolution of the constitutional issues at this time. Many factors inform this conclusion, not least among which is the preference to avoid resolution of constitutional issues when fairly possible. *See, e.g., Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

Reverend Halverson's letters indicate his sensitivity to Dr. Kurtz's objections and his desire to avoid disparaging the beliefs of nontheists in the future. While this correspondence does not rise to the level of a "rule," its importance should not be minimized. Reverend Halverson's letters, written by him as an officer of the United States Senate, give every indication of being the product of sincere and deliberate thought, and offer hope that Dr. Kurtz will find nothing in Reverend Halverson's future prayers with which to take exception. In this light, it is significant that plaintiff has not brought to the Court's attention any official remarks by Reverend Halverson that could be deemed disparaging in the several months subsequent to the filing of this suit. There is no reason to believe that Reverend Halverson's statement of intent, and his subsequent behavior, are for purposes of litigation only. *See Commodity Futures Trading Commn. v. Board of Trade,* 701 F.2d 653, 656 (7th Cir.1983).

Plaintiff has conceded that this suit would warrant dismissal as too attenuated if the Senate Chaplain placed a copy of their correspondence in a certain file—specifically, the file containing Senator Mansfield's and Dirksen's 1969 letter to Reverend Elson. Reverend Halverson has refused to accede to this request as a way of settling the case, asserting that the independence of his office would be sacrificed by accession to plaintiff's demand. As

stated above, however, the Reverend has given his "personal commitment that he will maintain [the correspondence] for the important audience to follow him" in the Chaplain's office. (Statement of counsel for Senate Chaplain, June 18, 1986 hearing.)

Wherever the correspondence is placed, it seems likely that knowledge of the correspondence will remain in the public domain. Dr. Kurtz's letters have attracted the considered attention of the Senate Chaplain and of the Senate administrative staff. They are now on file in this case and set out in the appendix to this opinion. Insofar as the dispute boils down to, and the continuation of this suit hinges on, where the correspondence will be stored, the litigation's "stakes" seem hardly significant enough to warrant this Court to venture upon the sensitive matter of parsing the words of prayer. *See Marsh,* 463 U.S. at 795, 103 S.Ct. at 3338.

Dismissal of this suit is also favored by the fact that it is not clear that judicial intervention is required. Plaintiff has failed entirely to seek relief through legislative channels. He has failed to ask his congressman to get the letters placed in the desired file, or read into the Congressional Record. His failure to exhaust other avenues of relief argues against judicial intervention.

In addition, there are separation of power concerns, and "[w]hile the separation-of-powers concerns presented by this case do not deprive the court of power to adjudicate under Article III ... they may affect the proper exercise of judicial discretion to grant or withhold declaratory relief for the stated claim." *Moore v. U.S. House of Representatives,* 733 F.2d 946, 954 (D.C. Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985). There is balancing to be done, and grants and denials of relief are properly influenced by many considerations, some of which bear only a tenuous relationship to the "merits" of the legal claim, defined in the narrowest sense.

In these circumstances, and in light of these considerations, even though the case is not constitutionally moot, it seems appropriate to withhold the equitable relief requested by plaintiff. *See, e.g., United States v. W.T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *Chamber of Commerce of the United States v. United States Dept. of Energy,* 627 F.2d 289 (D.C.Cir.1980) (per curiam); *Kurtz v. Kennickell,* 622 F.Supp. 1414 (D.D.C.1985). Since no relief will be granted, defendants' renewed motion to dismiss is granted.

## II.

Defendant, relying on *United States v. Munsingwear, Inc.,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950), asks this Court to vacate its prior jurisdictional holdings in Count II. *See Kurtz,* 630 F.Supp. 850. *Munsingwear,* says defendant, established a judicial policy of vacating preliminary holdings where the case giving rise to such holdings becomes moot prior to its final resolution. This policy "prevent[s] a judgment, unreviewable because of mootness, from spawning any legal consequences." *Munsingwear,* 340 U.S. at 41, 71 S.Ct. at 107.

In *Munsingwear,* the United States brought suit for injunctive and money relief for alleged violations by defendant of maximum price regulations. By agreement, the claim for injunctive relief proceeded first, while the claim for damages was held in abeyance. At trial, the District Court denied injunctive relief, finding that defendant's prices for its commodities complied with the regulations. The United States appealed, but the applicable price regulations were rescinded while the case was on appeal. Because there was no longer any basis for issuing injunctive relief, the Court of Appeals dismissed the appeal as moot. The problem arose when the United States then sought to pursue its claim for damages. The defendant argued that the action was barred by res judicata, pointing to the unreversed judgment of the District Court. The District Court and the Court of Appeals agreed. A divided Supreme Court affirmed. To plaintiff's argument that application of res judicata would be improper where plaintiff was denied appellate review of the district court's decision because of intervening mootness, the Supreme Court replied that this hardship was preventable. The plaintiff, the Court said, should have requested the Court of Appeals to vacate the judgment below prior to dismissing the appeal as moot.

Most important to the present matter, the Court reiterated that it is the duty of an appellate court to vacate prior holdings where the underlying case is dismissed as moot. This prevents a decision, unreviewable because of mootness, from having preclusive effect in subsequent proceedings. Though the present case is not constitutionally moot, defendant argues that the same principles require vacation of the prior jurisdictional holdings in Count II, presumably because they too are unreviewable.

Plaintiff argues in turn that the *Munsingwear* principle has no application outside of cases that are "truly moot." Pointing to *Moore v. U.S. House of Representatives, supra,* plaintiff asserts that when courts deny relief for prudential reasons, they do not vacate rulings on other issues, including issues of justiciability. *Moore* involved suit by members of the House challenging the constitutionality of the Tax Equity and Fiscal Responsibility Act. Plaintiffs argued that the act was unconstitutional because it originated in the Senate, in contravention of the "origination clause" of the Constitution, U.S. Const. art. I, § 7, cl. 2, which requires that "[a]ll Bills for raising revenue shall originate in the House of Representatives...." The District Court granted defendants' motions to dismiss, finding that plaintiffs lacked standing to bring suit, and that, in any case, equitable considerations compelled dismissal. 553 F.Supp. 267 (D.D.C.1982). On appeal, plaintiffs argued that the district court. erred in its standing analysis. The Court of Appeals agreed and, after full discussion, held that plaintiffs did in fact have standing to bring the suit. But the Court of Appeals affirmed the lower

court's dismissal on equitable grounds, relying principally on its reluctance to intervene in a dispute among members of Congress. Yet despite the dismissal and the presence of divisive jurisdictional issues, the Court of Appeals did not vacate its jurisdictional holding, and its "standing" decision has been relied upon subsequently in this Circuit. *See, e.g., Barnes v. Kline,* 759 F.2d 21, 26, 28 (D.C.Cir.1985).

*Moore,* however, is not on all fours with the present case. Dismissal in *Moore* was premised on the belief that the identity of the parties made the suit inappropriate for judicial intervention, and the decision contains no suggestion that future events might revive the case and render it fit for decision. Thus, dismissal did not implicate res judicata concerns. On the other hand, future events could revive the present controversy, and, by doing so, eliminate the grounds on which the present decision to dismiss rests. This action, therefore, may present res judicata concerns that were not present in *Moore.*

Insofar as the prior jurisdictional holdings in this case are res judicata, the principles underlying *Munsingwear* argue in favor of vacating those holdings. There is language in several opinions which suggests that jurisdictional holdings may have res judicata effect in subsequent proceedings. *See, e.g., Durfee v. Duke,* 375 U.S. 106, 111–113, 84 S.Ct. 242, 245–46, 11 L.Ed.2d 186 (1963); *Chicot County Drainage Dist. v. Baxter State Bank,* 308 U.S. 371, 377, 60 S.Ct. 317, 320, 84 L.Ed. 329 (1940); *Swift & Co. v. United States,* 276 U.S. 311, 48 S.Ct. 311, 72 L.Ed. 587 (1928); *Smith v. Alleghany Corp.,* 394 F.2d 381, 389 (2d Cir.), *cert. denied,* 393 U.S. 939, 89 S.Ct. 300, 21 L.Ed.2d 276 (1968); *Cutler v. Hayes,* 549 F.Supp. 1341, 1343 (D.D.C. 1982).

■ On the other hand, the jurisdictional holdings in this case do not create the same danger as the decision on the merits in *Munsingwear.* For a court has a duty constantly to review its jurisdiction and must dismiss a case where jurisdiction is found not to exist. *Insurance Corporation of Ireland v. Compagnie Des Bauxites,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982); *Safir v. Dole,* 718 F.2d 475, 481 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1206, 104 S.Ct. 2389, 81 L.Ed.2d 347 (1984); *Potomac Passengers Assn v. Chesapeake & Ohio Railway Co.,* 520 F.2d 91, 95 (D.C.Cir.1975). A court's obligation to deny its jurisdiction over nonjusticiable, political questions is no less important.

If indeed the parties here would be foreclosed from challenging Count II's jurisdictional holdings, it is unlikely that they would be prejudiced thereby. A court will consider the matter on its own motion. Exercising restraint over nonjusticiable political questions going to the internal operations of the United States Congress may be of greater importance to the court itself than to the parties before it. Furthermore, the existence of a colorable political question in this case is not likely to go undetected. Under these circumstances, it is apparent that this Court's jurisdictional holdings would not prevent it or any other court from considering anew the justiciability of plaintiff's claims. There is thus little threat that the holdings here would pose the kind of danger present in *Munsingwear.*[4]

■ Nevertheless, while *Munsingwear* may be distinguishable, it is appropriate under the facts of this case to follow *Munsingwear*'s lead and to vacate the jurisdictional holdings in Count II of the earlier opinion. This controversy has become too attenuated to warrant judicial intervention. Reverend Halverson has committed to Dr. Kurtz that he will guard against any suggestion of disparagement. Counsel for the Senate has reported that commitment publicly. In the circumstances, it would be

---

**4.** An exception to the *Munsingwear* doctrine is recognized where the parties themselves are responsible for the intervening mootness. *See Ringsby Truck Lines v. Western Conf. of Teamsters,* 686 F.2d 720, 721 (9th Cir.1982); *Cover v. Schwartz,* 133 F.2d 541, 546–47 (2d Cir.), *cert. denied,* 319 U.S. 748, 63 S.Ct. 1158, 87 L.Ed. 1703 (1942). This is another ground on which *Munsingwear* could be distinguished from the present case.

inappropriate to assume that there is any risk that Reverend Halverson or his successors will use, or that the Senate would permit him or them to use, the prayer opportunity in the future to disparage the beliefs of nontheists. Because it is so unlikely that future events will revive this controversy, there is no reason to preserve the jurisdictional holdings in anticipation of that day. Therefore, however slightly *Munsingwear* tips the balance, its influence is sufficient reason to vacate the jurisdictional holdings.

If, contrary to expectation, this or a similar controversy does revive, the judgment here vacated will have virtually the same precedential value as it would have had if it remained intact but unreviewed and unratified by an appellate court. As Justice Powell noted,

> Although a decision vacating a judgment necessarily prevents the opinion of the lower court from being the law of the case, the expressions of the court below on the merits, if not reversed, will continue to have precedential weight and, until contrary authority is decided, are likely to be viewed as persuasive authority if not the governing law of the ... Circuit.

*County of Los Angeles v. Davis,* 440 U.S. 625, 646 n. 10, 99 S.Ct. 1379, 1391 n. 10, 59 L.Ed.2d 642 (1979) (Powell, J., dissenting) (citations omitted).

An accompanying order will therefore dismiss the complaint and vacate the preliminary holdings under Count II of the Order filed March 11, 1986.

ORDER

The Clerk shall attach to the Memorandum filed in this case on August 22, 1986, an appendix consisting of the following four letters:

1. Letter dated March 27, 1986, from Senate Chaplain Richard C. Halverson to Professor Paul Kurtz;

2. Letter dated April 21, 1986, from Professor Paul Kurtz to Senate Chaplain Richard C. Halverson;

3. Letter dated April 24, 1986, from Senate Chaplain Richard C. Halverson to Professor Paul Kurtz; and

4. Letter dated May 8, 1986, from Professor Paul Kurtz to Senate Chaplain Richard C. Halverson.

It is so ORDERED.

UNITED STATES SENATE
OFFICE OF THE CHAPLAIN
WASHINGTON, DC 20510

March 27, 1986

Professor Paul Kurtz
Central Park Station
Box 5
Buffalo, New York 14215–0005

Dear Professor Kurtz:

Your lawsuit concerning guest chaplains and my opening prayers is now eighteen months old. Although we corresponded about guest chaplains prior to the beginning of the lawsuit, we have never communicated directly about the content of my prayers. Now that the district court has completed its consideration of the guest chaplain question, I thought I might write to you in the hope of contributing to a productive resolution of the remaining part of the case.

I have asked the Senate Legal Counsel to make clear to the court that it never has been and is not my intention to disparage any faith or belief, including the ideas of nonbelievers. I would like now to communicate that same thought directly to you. My abiding purpose in my opening prayers is to state affirmatively the positive beliefs which guide my thoughts and not to denigrate the values which are important to others. I hope that you will accept these sentiments as a sincere expression of my intentions, as I accept and appreciate the sincerity of your concerns.

Yours truly,

Richard C. Halverson

P.S. It would be a pleasure to meet you face to face. If you plan to be in Washington, let's have lunch together in the Senate Dining Room.

cc: Michael Davidson

FREE INQUIRY

Central Park Station, Box 5, Buffalo, New York 14215–0005—(716) 834–2921
Published by the Council for Democratic and Secular Humanism
*Editor*
Paul Kurtz (SUNY, Buffalo)

April 21, 1986

Reverend Richard C. Halverson
Office of the Chaplain
United States Senate
Washington, D.C. 20510

Dear Reverend Halverson:

Thank you for your letter of March 27. I have only recently had the opportunity to read it as I have just returned from an overseas trip.

I did not present my concerns about some of your opening prayers in our previous correspondence, which began in February, 1984, because it was not until the summer of 1984 that I reviewed them. By that time, I recall, I had decided to bring suit on the issues of your refusal to allow participation of non-theists in the opening ceremonies, and it seemed appropriate to litigate the issue of the content of some of your remarks at the same time.

But since I did not have a chance to explain my concerns previously, let me do so now.

I assume I do not have to tell you that disparagement of non-theists and/or their beliefs is not uncommon. Indeed, the belief that those who do not believe in God are, for that reason alone, immoral or otherwise worthy of condemnation is a very widespread prejudice. One indicator of this is the fact that when people, including public figures, state such things as "atheists can't be trusted" or "secular humanists approve of rape" little notice is paid to such remarks, as if these were perfectly natural and justified.

One of the principles I am most firmly committed to is freedom of speech. There is nothing I can do or would wish to do to limit their right to make such statements. However, as the official, publicly-funded chaplain of the U.S. Senate you are in a unique position, at least when you speak from your official pulpit. I would have thought that the Supreme Court would have concluded that a publicly-funded legislative chaplain is prohibited by the First Amendment. Among other reasons, there is a danger that such a religious official might use his tax-supported position to say things offensive to some minority groups, which is one of the things I would think the First Amendment was designed to prevent. But the Court evidently thought it could deal with that situation by indicating that the chaplains could not disparage other beliefs when they were speaking *qua* chaplains. Thus, because of your unique position I thought it was proper to review your official remarks to see if my tax dollars, and the tax dollars of other non-theists, were being used to subsidize statements which disparage us or our beliefs.

My impression was that a number of your remarks did disparage non-theists and their beliefs. I did not see any other was to interpret statements such as:

Awaken us to the reality that to govern without God is to be a godless government and a godless government soon loses its concern for human rights, minorities and all people.

The liberties of a nation cannot be secure when belief in God is abandoned. Help us to see the futility of the struggle to preserve liberty when faith in God is forsaken.

Father in Heaven, in a day when Godless forces would deny and destroy human rights, help us to see the futility in struggling to preserve them when we deny, privately and publicly, the God who gave them.

And frankly, I still do not see any other way to interpret these statements. To state that those who do not believe in God would deny and destroy human rights, disparages non-theists and their beliefs as surely as a statement that Moslems would deny and destroy human rights disparages Moslems, a statement that Catholics would deny and destroy human rights disparages Catholics, etc. If you have an explanation as to why your remarks should not be interpreted as disparaging, other than your statement that it was not your "intention" to disparage, I would be happy to receive it.

As to the court case, however, it is my impression that the Court may be more concerned with what you, or other chaplains might do in the future. It would seem to me that the best guarantee that disparaging remarks would not be repeated in the future would be a judicial declaration to the effect that such remarks cannot be made by publicly-funded legislative chaplains. With respect to your own situation, while I have not had the chance to review some of your recent opening prayers, I have been sent a column from the March 8, 1986 Danville (Va.) Register which quotes you as follows:

Religious tolerance may be a facade concealing deep intolerance . . .

A cover-up for godlessness by those who have no religious conviction. (To believe everything is to believe nothing.)

Historically, those systems whose policy was tolerance of all religion—or none—became intolerant of God-fearing people.

Rome, for example, tolerated all religions . . . but persecuted Jews and Christians.

Irreligion turns out to be vehement intolerance.

I have no way of knowing if this is an accurate quote (and the rest of the column, a copy of which is enclosed, is somewhat garbled), but if it is accurate it certainly suggests that you continue to believe that "tolerance of all religion—or none" is unwise. But I will leave it up to the Court to decide whether your letter is sufficient assurance that the chaplains' pulpit will not again be used to attack "the godless" or any other group.

By the way, thank you for your invitation to meet with you. The next time I am in Washington I will try to give you a call.

Sincerely,

Paul Kurtz

UNITED STATES SENATE
OFFICE OF THE CHAPLAIN
WASHINGTON, DC 20510

April 24, 1986

Mr. Paul Kurtz
FREE INQUIRY
Central Park Station, Box 5
Buffalo, New York 14215–0005

Dear Mr. Kurtz:

Your letter of April 27 has been carefully and thoughtfully read and I wish to express my appreciation for it. You do not know me, but I trust you will not feel I am defensive in this attempt to respond in a way that hopefully will nurture friendship.

As I read the prayer excerpts which you included in your letter, it was not at all difficult to understand your perceptions of them as "disparaging to nontheists and nonbelievers". I accept your interpretation but hope you can believe me when I tell you honestly such reaction was a great surprise to me. But also an eye opener. Disparagement was the farthest thing from my mind, therefore it was helpful to get that reaction.

As a pastor for over 40 years, my constant concern, especially as I matured in the pastoral role, was the consistency between profession and life of those to whom I ministered. Prayers like the ones to which you refer were motivated totally by a pastoral purpose for biblical instruction and as an apologetic to support and strengthen believers with a rationale for their faith.

It has been a conviction throughout my total ministry that the most effective way the church can have its maximim influence in the world is by integrity between life and profession. It has never been a part of my ministry to "attack" those who believe differently. As a matter of fact, I have been constantly concerned for myself as well as all who profess faith, that our behavior not contradict what we profess to believe lest such inconsistencies justify those who are critical.

I believe that tolerance is authentic only in the context of conviction whatever that conviction. Tolerance is not a synonym for indifference.

I would like you to know that when first informed of your reaction to my prayers I not only regretted that disparagement had been communicated, but have tried subsequently to guard against such a possibility.

For me the biggest word in our faith is love which comprehends the whole law. Though it is most abused in our contemporary culture to me the word means "goodwill toward all." Your friendship, not your enmity, is important to me however much we disagree. I honor your right to believe as you do and support you in it.

Incidentally, never in my life have I felt that nonbelievers were purveyors of evil, immorality or violence, etc. Actually, not uncommonly, those who profess religion have often been guilty of such contrary behavior. It is my observation that the strongest argument against Christ and the Gospel is a good person, who denies the necessity of such faith. The failure of the church to be god-like is supportive of those whose lives are above reproach and who are critical of the church. Jesus said he had not come to call "the righteous but sinners to repentance." He said "they that are whole do not need a physician but they that are sick." I have often said publicly that there ought to be a sign over the door of every church, "For Sinners Only".

This response will probably not resolve much, but I would like you to know that to disparage another is contrary to my nature and desire.

Please let us try to get together when you are in Washington.

Sincerely,

*Richard C. Halverson*

Richard C. Halverson

FREE INQUIRY

Central Park Station, Box 5, Buffalo, New York 14215-0005—(716) 834-2921
Published by the Council for Democratic and Secular Humanism
*Editor*
Paul Kurtz (SUNY, Buffalo)

May 8, 1986

Reverend Richard C. Halverson
Office of the Chaplain
United States Senate
Washington, D.C.  20510

Dear Reverend Halverson:

Thank you for taking the time to explain to me more fully your views and for your expression of good will.  Your letter was appreciated.

I have never regarded this lawsuit as a personal matter between you and me, so I hope you are not offended by the fact that I have instructed my attorney not to dismiss the case at the present time.  It seems to me there is still some value in having a court declare that there are certain limits to what a publicly-funded legislative chaplain might say, if only for the guidance of future chaplains.

Thank you again for the invitation to meet with you.  I do not have any present plans to be in Washington, but I may be in the area later in the year, and if so I will definitely try to contact you.

Sincerely,

Paul Kurtz